[Sac. No. 2089.   Department Two.—April 8, 1914.]

## P. F. WOOD, Appellant, v. C. MANDRILLA, Respondent.

DEEDS—INTERPRETATION OF WORDS—ORDINARY MEANING.—Words used in a conveyance are to be given their ordinary and popular meaning, unless they are used in a special or technical sense, or the context shows that they are used in a different sense.

ID.—WORD "HALF"—LITERAL SIGNIFICANCE.—The word "half," when used without qualification in a deed, must be given its literal significance as one of two equal parts of the property described.

ID.—FRACTIONAL QUARTER SECTION—GRANT OF "EAST HALF."—A deed to the "east half" of a fractional quarter section of land, which

makes no mention of· acreage, conveys the east half in quantity, where the division of the quarter section, under the rule as to government surveys, divides the quarter into halves of equal quantity or acreage.

ID.—SURVEYS—DIVISION OF FRACTIONAL QUARTER SECTION.—Where in the survey of public land there has been no return of a line run in the field dividing a fractional quarter section into halves, and no corner common to the east and west halves fixed at any point along the boundary line of such quarter, and the field notes show that a continuous unbroken line was run from the southeast to the southwest corners of the quarter section, it is the duty of the surveyor-general, in drawing a line on the plat dividing such quarter section into east and west halves, to run the line through the quarter section north and south from a point on the boundary line equidistant from the southeast and southwest corners of the quarter section.

ID.—PRACTICAL CONSTRUCTION OF DEED.—The rule as to the practical construction of a deed applies only when the language on the face of the instrument is doubtful, uncertain, or ambiguous.

APPEAL from a judgment of the Superior Court of Tulare County and from an order refusing a new trial. W. M. Conley, Judge presiding.

The facts are stated in the opinion of the court.

C. L. Russell, for Appellant.

Hannah & Miller, for Respondent.

LORIGAN, J.—This is an action in ejectment to recover a strip of ten acres of land, part of the southwest quarter of section 30, township 20 south, range 24 east, in Tulare County. This quarter section was originally government land—the fractional quarter section containing 178.98 acres as returned by the surveyor under the government survey, but as shown by the evidence in the case in fact contains about one hundred and eighty acres. This quarter section, under one entry and as one tract, was patented in 1872 to the predecessor in title of plaintiff. On October 22, 1909, plaintiff, while still the owner of the whole quarter section, conveyed a portion of it to defendant, the deed describing the part conveyed as ''The east half of the southwest quarter of section 30, township 20 south, range 24 east, Mount Diablo base and meridian.'' No acreage was mentioned in the deed. Defendant, claiming

that the deed conveyed to him the east half of the quarter section in quantity or acreage, took possession of about ninety acres thereof. Plaintiff claiming, on the other hand, that such deed did not convey the east half in quantity of the quarter section, but only eighty acres, as such east half, and that a strip of land of about ten acres running north and south taken possession of by defendant, was part of the west half and not the east half of the section, brought this action to recover possession of said strip. The court found that the defendant under his deed from plaintiff acquired title to the east half of the quarter section in acreage and quantity, which included the strip in dispute, and accordingly gave judgment in his favor. Plaintiff appeals from this judgment and the order denying his motion for a new trial.

The principal question arising on this appeal is whether the deed to respondent included the strip in question. As the quarter section owned by appellant contained approximately one hundred and eighty acres, the deed of appellant to respondent of the east half of it, without mention of the number of acres intended to be conveyed thereby (unless there is some merit in the claim of appellant presently to be noticed) transferred to respondent one-half in quantity, and hence included the strip in controversy as a part thereof. Words used in a conveyance are to be given their ordinary and popular meaning, unless used in a technical sense, or having a special meaning, or the context shows that they are used in a different sense. The word "half" has a plain, common, and natural meaning, and when used in describing lands is to be understood literally. There is nothing uncertain or equivocal in the term, and if used without qualification in the deed to respondent must be given its literal significance as one of two equal parts into which anything may be divided, and to have conveyed to him the east half of the quarter section in quantity and acreage. (*Jones* v. *Pashby*, 62 Mich. 614, [29 N. W. 374] ; *Cogan* v. *Cook*, 22 Minn. 137.)

Appellant does not question but what the usual construction of the word "half" means one-half in quantity, but insists that, as used in describing a tract of land conveyed as the east half or west half of a subdivision of a government survey, the terms "east half" or "west half" thereof are not used with reference to quantity, but with reference to a line

fixed by governmental survey as dividing such subdivision into east and west halves; that the expression in the deed to respondent "Mount Diablo base and meridian" as part of the description of the land conveyed operates, as appellant states it, to "tie the description to the United States government survey" and that a plat of such survey introduced in evidence by consent of both parties shows that this fractional quarter section was subdivided by a government survey into east and west halves, the east half containing eighty acres, and hence excludes the idea that any greater quantity was intended to be conveyed by the deed. The effect of the deed is discussed by both parties on the theory that the government survey of the township in which this fractional quarter section lies is incorporated as a part of the description thereof, the position taken by respondent being that under the survey, and the application thereto of the acts of Congress, the same result follows as would follow from giving the word "half" its literal meaning and that the deed conveys one-half in quantity, which includes the strip in controversy.

In surveying a township where fractional sections occur these are thrown on the west and north lines of the township. Such fractional sections occur in the survey of this township. The plat of the township was, as said, introduced in evidence, as there was also testimony respecting the lines of the fractional quarter section under consideration as shown by the field notes of the survey thereof.

Section 2395 of the Revised Statutes of the United States [Comp. Stats. 1901, p. 1471, 6 Fed. Stats. Ann. 363], required the surveyor-general, upon the return to him of the surveys in the field of government land by the deputy surveyors, to "cause therefrom a description of the whole lands surveyed to be made out and transmitted to the officer who may superintend the sales. He shall also cause a fair plat to be made of the townships and fractional parts of townships, of the lands describing the subdivisions thereof and the marking of all the corners," and send copies to the place of sale and to the general land-office.

In conformity with this requirement the plat introduced in evidence was prepared. On it a line was drawn, presumably when the plat was prepared in the surveyor-general's office, running north and south through all the tier of fractional

quarter sections on the west side of the township, including the fractional quarter section in question.  To the east of this line so drawn and in each fractional section are marked the figures ''80,'' doubtless intended to mean eighty acres, and to the west of said line figures are placed representing whatever the remaining acreage is of each fractional section as the total acreage of each of these quarter sections was computed by the surveyor-general; the figures to the west of the line in this fractional quarter section being ''98.98.''  It is by reason of this line on the plat prolonged through this particular fractional quarter that appellant bases his claim that by government survey the east half thereof is fixed at eighty acres in quantity, and hence, only that acreage was conveyed by the deed.  While this is a reasonable argument to make on the face of the plat, there is to be taken into consideration the fact that it is not the plat alone that governs in the matter. The plat is only a record of the surveys and must be made in conformity thereto.  The surveys in the field of government land, and the acts of Congress relative to them and to which the plat must conform, control as to what various subdivisions of the township have been created by the surveys, or when a division of a subdivision thereof has not been actually segregated by a survey, the method by which such division should be ascertained, should occasion arise in a disposition of the public lands to do so.  We have already referred to the section of the Revised Statutes (2395) relative to the plat to be made by the surveyor-general from the surveys returned. The sections of the same statutes immediately following—2396 and 2397—prescribe the method of surveying government lands and the method of subdividing surveyed divisions thereof when it may become necessary.

Section 2396 declares:

''The boundaries and contents of the several *sections, half-sections and quarter-sections* of the public lands shall be ascertained in conformity with the following principles:

''First.  All the corners marked in the surveys, returned by the surveyor-general, shall be established as the proper corners of sections, or subdivisions of sections, which they were intended to designate; and the corners of half and quarter sections, not marked on the surveys, shall be placed as nearly as

possible equidistant from two corners which stand on the same line.

"Second. The boundary line *actually run and marked* in the surveys returned by the surveyor-general shall be established as the proper boundary lines of the sections, or subdivisions, for which they were intended, and the length of such lines, as returned, shall be held and considered as the true length thereof. And the boundary lines which have *not* been *actually run and marked* shall be ascertained, by running straight lines·from the *established* corners to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary lines shall be ascertained by running from the established corners due north and south or east and west lines, as the case may be, to the watercourse, Indian ·boundary line, or other external boundary of such fractional township.

"Third. Each section or subdivision of section, the contents whereof have been returned by the surveyor-general, shall be held and considered as containing the exact quantity expressed in such return; and the half sections and quarter sections, the contents whereof shall not have been thus returned, shall be held and considered as containing the one-half or the one-fourth part, respectively, of the returned contents of the section of which they make a part."

Section 2397 provides as follows:

"In every case of the *division* of a quarter section the line for the division thereof is run north and south, and the *corners and contents of half quarter sections,* which may thereafter be sold, shall be ascertained in the manner and on the principles directed and prescribed by the section preceding. . . ."

The italics are ours, as are any hereafter used.

It will be observed that section 2396, quoted, prescribing the method of surveying public lands, does not provide for the survey of a township into smaller subdivisions than a quarter section, and in this case, while it appears that the quarter section under consideration was surveyed, it was shown by the evidence that in fact there never was any survey by the government dividing or segregating this fractional quarter section into any lesser subdivisions; there were no monuments established or corners set or boundary line run

through the quarter by the authority of the government creating any lesser subdivisions. On the contrary the field notes of the survey show a continuous unbroken line of survey along the south line of the fractional quarter from the southeast to the southwest corners thereof, and the absence of any monument or corners established thereon. There being then no provision in the law respecting the making of government surveys requiring the survey of any lesser subdivision than a quarter section, and in the matter of the survey of this particular quarter section it appearing that in fact there was no survey of a lesser subdivision, if occasion arose calling for a division of it into an east and west half, sections 2396 and 2397 referred to point out first how it must be done, when in the first section it is declared that "the corners of half and quarter sections, not marked on the surveys, shall be placed as nearly as possible equidistant from two corners which stand on the same line," and the other section which provides that "In every case of the *division* of a quarter section the line for the division thereof is run north and south, and the *corners and contents of half quarter sections, which may thereafter be sold, shall be ascertained in the manner and on the principles directed and prescribed by the section preceding.*" Here the statutes quoted directly provide the method of ascertaining a line as to the division of a quarter section which has not been actually run in the field. Here, as we have seen, there was no return in the survey of a line run in the field dividing this quarter section into halves; no corner common to the east and west halves was fixed at any point along the boundary line of said quarter and the field notes show that a continuous unbroken line from the southeast to the southwest corners of the section was run. Under these conditions, if it was the intention of the surveyor general in making this plat (a matter to be presently considered) to draw a line on the plat dividing this quarter section into east and west halves, it was his duty under the provisions of the statute to have run this line through the quarter section north and south from a point on the boundary line equidistant from the southeast and southwest corners of the quarter section. This, as the exterior lines of the survey of this quarter section were parallel, would have divided said quarter section into east and west halves equal in quantity, and the tract of land

conveyed by the deed of plaintiff as the east half of the quarter section ascertained in the manner provided for by Congress would convey one-half in acreage and quantity, as the trial court found. (*Jones* v. *Pashby,* [62 Mich. 614, 29 N. W. 374] ; *Edinger* v. *Woodke,* 127 Mich. 41, [86 N. W. 991].)

It is to be observed, too, that occasion for a division of a quarter section into east and west halves could only arise, if it arose at all, after the making of the plat and the lands opened to entry, and then only in the event that there were two or more entries made of portions of the quarter section "which may thereafter be sold." As to this particular quarter section, no such occasion arose, because the entry of the land by the predecessor in title of plaintiff in the land-office was of the whole of this fractional quarter section and it was patented to him by the government as a whole.

It is to be further noted that on the plat itself the "80" acres as marked there to the east of the line are not described or designated on the plat as the east half of the quarter section, nor the "98.98" acres on the west as the west half thereof. In fact any designation of the "80" acres as the "east half" of the quarter section not only does not appear on the plat or in the survey, or at all, until it appears in the complaint in this action and reference made to it as such in the course of the trial. Nor does the line on the plat necessarily imply that it was intended to divide this quarter section into east and west halves of the marked acreage, or to do anything more than to aid the officials in the land-office in disposing of the government lands; to facilitate their entry and sale and as a convenience to such officials and to entrymen. As suggested by counsel for respondent, by the homestead laws under which a settler acquires title by residence and improvement to the land embraced in his entry, if it exceeds one hundred and sixty acres the entryman was required to pay for the excess and the marking on this plat of these eighty-acre tracts on the east side of a line drawn north and south through all the fractional sections on the west of the township would aid in reducing the number of cases in which such excess payments would otherwise have to be made, and in other respects might aid in making other entries. These considerations may have actuated the surveyor general in placing the line on this plat and marking the acreage on

either side of it. This presumption it is proper to indulge in because it furnishes the only reasonable excuse for the presence of the line upon the plat at all. Certainly its presence there could not legally represent a division of a fractional section into east and west halves and as to this section make the east half contain "80" acres and the west half "98.98" acres, not only because the surveyor-general had no authority whatever to do this, but because any attempt on his part to do so would be in direct violation of the provisions of the acts of Congress declaring how, when necessary, the divisions of a quarter section into halves must be made.

Taking it, then, that as the deed designated the land according to the system of surveys of government land, it was the intention of the parties that the tract should be ascertained in the same manner that the east half of a fractional quarter section should be ascertained under it, we find that no tract of land known or designated as the east half of this quarter section was ever surveyed or segregated by a government survey. The government surveyed the fractional quarter section and then provided by law how such a quarter section should be divided to ascertain the east and west halves thereof; that this should be done by a line run north and south from a point equidistant from two corners which stand on the same line. The division of this quarter section made under this rule as to government surveys does, as all the lines of this quarter section are parallel, divide the quarter into halves equal in quantity and, hence, the deed from plaintiff to defendant of the east half of the quarter section conveyed to him the east half in quantity.

It is further contended by appellant that it being doubtful from the language in the description in the deed how much land was intended to be conveyed by it, the practical construction given it by defendant in taking possession originally of only eighty acres and holding possession to such extent for some seven months before he ousted plaintiff from the ten acres in controversy should control. This rule as to the practical construction of a contract applies, however, only when the language on the face of the contract is doubtful, uncertain, or ambiguous, and there is nothing of that kind in this deed. Aside from this, it is merely an assumption upon the part of counsel for appellant that plaintiff only went into possession

originally of eighty acres under this deed. There is nothing in the evidence that shows this. While the deed to defendant was made in October, 1909, there is no evidence that he went into possession of any of the land he claimed under it prior to May 10, 1910, when he ousted plaintiff from the strip which he claimed was part of it.

The judgment and order appealed from are affirmed.

Henshaw, J., and Melvin, J., concurred.